HERIBERTO SOLER and SARA SOLER, Petitioners v COMMISSIONER OF INTERNAL REVENUE, Respondent
Soler v. Commissioner
Docket No. 20141-80.
United States Tax Court
T.C. Memo 1983-730; 1983 Tax Ct. Memo LEXIS 54; 47 T.C.M. (CCH) 546; T.C.M. (RIA) 83730; December 8, 1983. *54 Luis Medina, for the petitioners. Judy K. Hunt, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined a $12,099.95 deficiency in petitioners' income tax and a $605 addition to tax under section 6653(a), I.R.C. 1954, for the year 1976. The principal issue is whether petitioner Heriberto Soler earned unreported wagering commissions in the amount of $35,114.28 in 1976 as a "writer" in an illegal lottery conducted in the Miami, Florida, area. Petitioner contends that he did not have any association with that lottery and did not earn any of the alleged wagering commissions. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioners Heriberto and Sara Soler, husband and wife, filed their joint 1976 Federal income tax return with the Internal Revenue Service Center in Chamblee, Georgia. At the time the petition herein was filed, petitioners' legal residence was 3411 S.W. 21st Street, Miami, Florida 33145. The husband will sometimes hereinafter be referred to as petitioner or Heriberto. Petitioner is *55 one of a large community of Cubans residing in the Miami, Dade County, Florida, area. He has resided in Miami at least some 12 or 13 years. In 1976 he was a "supervisor" for a corporation engaged in construction work. The only income reported on petitioners' 1976 joint return was $13,250, which represented Heriberto's earnings in that occupation. The conduct of illegal lotteries in Dade County, Florida, was widespread, as evidenced by the existence of A Lottery Unit of the Organized Crime Bureau of the Metro Dade Police Department. The head of that unit is a police officer, Sergeant James Boyd, who has been in that position some 10 or 11 years. He is thoroughly familiar with the nature of the operation of illegal lotteries in his territory and is particularly knowledgeable about the practice of such lotteries run by Cubans and patronized by members of the Cuban community in the metropolitan Dade County or Miami area. In the operation of the lottery involved herein patrons would place bets with an agent or "writer" in the enterprise. The writer, after deducting his commission and taking into account the pay-offs required in respect of the "hits" (or winning numbers) would *56 settle periodically with the owner of the lottery by making payment to a pick-up man. The pick-up man in turn would deliver such payments to the "counting house" for the enterprise. After a certain amount of surveillance of a pick-up man and a counting house, officers of the Lottery Unit, on March 20, 1976, executed a search warrant of the counting house, located at 7771 S.W. 20th Street, Miami, Florida. That house was the residence of a Mr. Jorge Nunez (Nunez), who was then arrested and later convicted of the illegal possession of lottery paraphernalia and lottery tickets. Nunez was either one of the owners, or at least a principal employee, of the illegal lottery. Records seized during the foregoing search indicated that an illegal lottery was being operated from Nunez's house at least during the months of December 1975, January 1976, February 1976, and up to March 20, 1976. Among the records seized at the counting house were a small address book, certain ledger ("activity") sheets showing on a twice-weekly basis [1] the gross bets, commissions, and other data in respect of separately identified writers of bets, and some summary ledger sheets showing profit or loss to the *57 lottery in respect of the separately identified writers. Such writers were identified in the various sheets and the address book not by full name, but only by a single name, either a first name or a last name, or possibly a nickname or alias. One of the names thus appearing was "Heriberto". The address book generally did not contain addresses, but it did contain a seven-digit telephone number associated with each name. Such an "address" book was important in the lottery operation, since communication by telephone was a significant aspect of the enterprise. By use of a special telephone directory available to the police department, Sergeant Boyd attempted to see whether there was any apparent connection between the names in the address book and the names associated *58 with the subscribers having the phone numbers appearing in the address book. He found no correlation whatever, and concluded, in accord with his experience in other illegal lotteries in Dade County, that the phone numbers were in code. The code turned out to be a simple one, and he succeeded in breaking it. The decoding process required merely moving the fourth digit of the seven-digit number to sixth place. The names of the actual subscribers associated with the decoded phone numbers in a significant number of instances matched up with the corresponding names in the seized address book. [2]
The phone number in the address book associated with the name "Heriberto" was 444-1280. As decoded, it became 444-2810. The latter was the phone number of petitioner Heriberto Soler, 3411 S.W. 21st Street, Miami, and had been petitioner's phone number for some years at the same address. There was no other person named Heriberto living at that address. Unlike such frequently used Spanish *59 names as Juan, the name "Heriberto" is not a common Spanish name. Proceeding on the premise that the writer "Heriberto" in the illegal lottery was petitioner Heriberto Soler, the Commissioner, relying on data in the seized records, concluded that he had received unreported wagering commissions in the aggregate amount of $35,114.28 [3] in 1976, and accordingly determined a $12,099.95 deficiency in petitioners' 1976 income tax. [4]
*60 OPINION The evidence persuasively indicates that the operation of illegal lotteries was common in the Miami, Dade County, area, and that they were widely patronized by members of the extensive Cuban community. As a result of the raid on a counting house of one of these lotteries on March 20, 1976, various records were seized that revealed the names of at least some of that lottery's "writers" (i.e., those who took bets on behalf of the lottery). Among the seized records were certain ledger sheets, so-called "activity" sheets (see n. 3, supra), for December 1975 and that portion of March 1976 up to the date of the raid, which disclosed in detail the gross amount of bets taken by each writer in respect of each of the twice-weekly drawings, and the amount of commission earned by each such writer in respect of each drawing. Such commissions were generally equal to 30 percent of the amount of gross bets taken by the writer. One of those writers was a person identified only as "Heriberto". Although the seized records did not include the "activity" sheets for January and February 1976, they did include summary ledger sheets showing the amount of the enterprise's gain or loss attributable *61 to each writer in February, and those summary ledger sheets disclose such gain or loss attributable to "Heriberto" for each day on which the twice-weekly drawings took place during February. Other evidence indicates that "Heriberto" was active as a writer in January 1976; certainly, there is no contention to the contrary. Plainly, "Heriberto" was an active writer in the lottery operation during the entire period in question, and the rate of his commissions clearly appeared to be 30 percent of the gross bets taken by him in December 1975 as well as in March 1976 up to the date of the raid. Even in the absence of "activity" sheets for January and February 1976, the Commissioner was able to compute an average commission for each drawing date, based on the specific figures for December 1975 and March 1976, and there is no dispute between the parties that such average amounts could fairly be imputed to "Heriberto" for each drawing date in January and February. The sole issue for decision is simply a factual one, namely, whether the writer "Heriberto" was petitioner Heriberto Soler. We find on the evidence before us that he was. A crucial item of evidence in making this finding is *62 a small "address" book that was seized by the police officers in their raid of March 20, 1976, at the counting house of the lottery. The "address" book was basically not a book of addresses, but rather a book of telephone numbers of writers and other persons connected with the lottery. The nature of the operation was such that the use of the telephone was an important aspect of the enterprise, and the "address" book was a significant component of the seized records. The names appearing in the "address" book were merely single names -- either first names, nicknames, last names, or possibly even aliases. And the names of the writers on the "activity" sheets as well as on the summary ledger sheets were similarly single names, which were generally the same as the single names in the "address" book. Thus, the writer "Heriberto" appearing on the "activity" and summary ledger sheets was recorded in the "address" book simply as "Heriberto". We think that the Commissioner was fully justified in determining that petitioner Heriberto Soler was the writer "Heriberto" in the illegal lottery. The seven-digit phone numbers associated with virtually all of the names in the "address" book were *63 persuasively shown by the evidence before us to have been in code. The use of only single names and coded phone numbers obviously reflected an attempt at concealment in view of the illegality of the lottery. However, the officer in charge of the Lottery Unit of the police department, who had had wide experience in such matters, succeeded in breaking the code. The actual phone number was obtained simply by moving the fourth digit of the seven-digit coded number to sixth place. Accordingly, when this process was applied to the number associated with "Heriberto" in the "address" book, the decoded number turned out to be precisely that of petitioner Heriberto Soler, and had been his residence phone number for a number of years. No other person named Heriberto was shown to have lived at that residence. Moreover, the name Heriberto is not a common Spanish name. Petitioners' sole witness was petitioner Heriberto Soler himself, who testified briefly through an interpreter. (It was represented to the Court that he did not speak English and that he had very little understanding of spoken English.) He denied ever having been involved in illegal gambling or that he had even known Jorge *64 Nunez. In addition, petitioners submitted copies of bank statements of their joint account, in which the checks for Mr. Soler's net periodic wages as a construction worker or supervisor constituted virtually the only deposits during the period in question. He denied, in response to leading questions of his counsel, that he had any safe deposit box during the year or that he had acquired during 1976 "any automobiles, any houses, any assets of significance". He finally indicated in response to his counsel's leading question that the deposited "checks from [his] employment represent[ed] all the income that [he] earned during that year". We do not find petitioner's self-serving and uncorroborated testimony sufficiently convincing to carry his burden of proof in the context of this case. To be sure, his bank account for the months involved did not reflect any deposits traceable to lottery commissions, but it is at least equally likely that no deposits would have been made of any such commissions, which would have consisted simply of cash withheld from the gross bets received. What troubles us particularly in respect of petitioner's failure to carry his burden of proof is that *65 no effort was made on his behalf to locate or subpoena Jorge Nunez or anyone connected with the lottery to testify that petitioner Heriberto Soler was not the "Heriberto" involved in the lottery. To be sure, it was stated by petitioners' counsel that he did not know of Nunez's whereabouts, but he made no effort to find out. Moreover, the discovery procedure was open to counsel to obtain leads to other participants in the illegal lottery who might have been able to supply pivotal evidence to establish that Heriberto Soler was not the "Heriberto" of the lottery operation. However, the record is silent as to any such efforts. In sum, (1) the Government has established a strong connection between petitioner and the illegal lottery as a result of the decoded telephone number which was precisely that of petitioner; (2) the coded number was identified with a person designated as "Heriberto", an uncommon Spanish name; (3) "Heriberto" was an active participant in the lottery during the entire period in controversy; and (4) petitioners made no affirmative effort, by way of discovery or otherwise, to locate or subpoena anyone connected with the lottery, who might have testified that petitioner *66 was not the writer "Heriberto". In the circumstances, we find that petitioner's sparse self-serving testimony does not tip the scales in his favor. Finally, with respect to the five percent addition to tax pursuant to section 6653(a), I.R.C. 1954, petitioners bear the burden of proof and have offered no evidence to establish that their underpayment was not "due to negligence or intentional disregard of rules and regulations". Bixby v. Commissioner,58 T.C. 757, 791, 792 (1972). Accordingly, respondent's determination of the deficiency and addition to tax is sustained. Decision will be entered for the respondent.
Footnotes
1. It appears that the lottery operation conducted two lotteries a week: one each Wednesday with the winning numbers based upon the winning numbers in that day's Puerto Rican national lottery; and one each Saturday with the winning numbers determined with respect to the activity at local dog tracks. The twice-weekly entries, which are dated Wednesday and Saturday for each week, reflect these two one-a-week lotteries.↩
2. Where there was failure to find such correlation, it turned out that in some instances the names in the address book appeared to be nicknames, and in some instances the phones had been disconnected.↩
3. There is no controversy between the parties as to the correctness of this amount if petitioner Heriberto Soler is the "Heriberto" appearing in the records seized in the March 20, 1976, raid of the counting house. The amounts attributed to him for the period March 1-20, 1976, are precisely those appearing in the "activity" sheets for that period.The amounts attributable to Heriberto for January and February can be extrapolated from information in the record. The summary ledger sheet for February denotes that "Heriberto" was active in respect of all the twice-weekly drawings in that month, and there is evidence in the record, including the opening entries on the February ledger sheet and the ongoing nature of the lottery, to conclude that the lottery operated on each Wednesday and Saturday in January. The Commissioner accordingly determined an average commission attributable to "Heriberto" for each day on which there was a drawing, based on "Heriberto's" actual commissions for December 1975 and March 1-20, 1976. The Commissioner then used that average as a basis for computing "Heriberto's" January and February commissions. No objection has been raised as to the method thus used, and it is here found to be entirely acceptable. ↩
4. As a result of increase of petitioners' gross income by $35,114.28, the Commissioner made two other automatic adjustments, reducing the medical expense deduction (which is affected by the amount of adjusted gross income) and increasing the local sales tax deduction (which was based on tables that correlated with gross income). These automatic adjustments are not in dispute.↩